## EDISON ELECTRIC CO. v. CITY OF PASADENA.

(Circuit Court of Appeals, Ninth Circuit. May 2, 1910.)

No. 1,739.

1. MUNICIPAL CORPORATIONS (§ 250*)—LIGHTING CONTRACT—CONSTRUCTION—INTENT.

That an alleged lease of an electric company's street lighting appliances to a city for a term of years did not express an intention that the lessor should light the streets did not prevent such intention from being implied.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. §§ 688–691; Dec. Dig. § 250.*]

2. MUNICIPAL CORPORATIONS (§ 233*)—STREET LIGHTING CONTRACT—LEASE—VALIDITY.

A contract between a city and an electric company owning a street lighting plant purported on its face to be a lease of the company's lighting system to the city for specified "rentals." There was nothing in the contract disclosing the source of the electric power to be used, but another written contract made at the same time required the electric company to furnish the power to be used through the so-called "leased" system for one year on specified terms, with provisions for extensions covering the entire period for which the system had been leased. The lease also required the electric company to make extensions to keep its appliances in repair without cost to the city, and reserved to the company the right to use the distributing system to furnish light and power to private individuals. *Held*, that such alleged lease construed with the contract to furnish power, was not a lease in fact, but an attempted evasion of the city's charter, prohibiting the making of a street lighting contract for a longer period than a year, or any contract to pay for electric light at a higher rate than the minimum price charged to any other consumer.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. §§ 666, 667; Dec. Dig. § 233.*]

3. MUNICIPAL CORPORATIONS (§ 248*)—STREET LIGHTING CONTRACTS—INVALIDITY—QUANTUM VALEBANT.

Where an electric street lighting contract between an electric company and the officers of a city was a direct evasion of the city's charter prohibiting the making of such contracts for a longer period than a year, the acceptance of benefits thereunder by the city raised no implied obligation to compensate the electric company therefor.

[Ed. Note.—For other cases, see Municipal Corporations, Dec. Dig. § 248.*]

In Error to the Circuit Court of the United States for the Southern Division of the Southern District of California.

Action by the Edison Electric Company against the City of Pasadena. Judgment for defendant, and plaintiff brings error. Affirmed.

The written instrument upon which this action was brought is as follows:

"Contract.

"Leasing Street Lighting System.

"This instrument, executed in duplicate by the city of Pasadena, a municipal corporation within the county of Los Angeles, state of California, and herein called 'the city,' and the Edison Electric Company, a corporation organized under the laws of the state of Wyoming, and herein called 'the Company,' witnesseth:

"First. That the Company is the owner, and enjoying the use and occupation, within the public streets of the city of Pasadena, of a system of poles, wires, lamps, brackets, and other apparatus constituting a complete street equipment for the purpose of transmitting electricity, and for the purpose of lighting the public streets and places within said city, as well as furnishing light and power to others than said city. That during several years prior to the date hereof it has, with the use of a portion of said system, been furnishing the city with electric light for lighting its streets and public places. That scattered about the said city, and in places located by said city, there are now installed and in use for lighting said city, as a part of said street lighting system, fifty-four (54) long burning arc lamps, and thirteen hundred and twenty-one (1,321) 16-candle power incandescent lamps, all properly connected with the necessary apparatus for their present actual and continued use. That the city wishes to light its streets and public places at a less expense for area lighted than heretofore.

"Second. That said city and said company do agree as follows:

"Article 1. Lease.—That the Company hereby leases unto the city, and the city hires from the Company, that part of the Company's said electric distributing system within said streets and public places, which is now, and heretofore has been, used for the purpose of furnishing the city with light; together with such extensions thereof as may during such leasehold period be installed for such public lighting purposes—all upon the terms and conditions named in the following articles:

"Article 2. Duration.—The leasehold period shall continue from the first day of July, 1904, to and including the 30th day of June, 1909—a period of five years.

"Article 3. Rental.—The city to pay to the Company as rental for the use of said system, nine thousand eight hundred and fifty-five ($9,855.00) dollars for each of the first three years of said period, and nine thousand two hundred and ninety-six and $70/100$ dollars ($9,296.70) for each of the last two years of said period, said rentals for each year to be paid in equal monthly installments, and on or before the 15th day of each calendar month thereof; and as rentals for the arc lamps and incandescent lamps, the apparatus connected therewith as extensions to said system, as hereinafter provided, and on or before the 15th day of each calendar month the city shall pay to the Company as follows:

"For each arc lamp and the apparatus connected therewith, from the date of its installation until July 1st, 1907, four and $20/100$ dollars ($4.20) per month; thereafter, three and $95/100$ dollars per month; and for each incandescent lamp and the apparatus connected therewith from the date of its installation until July 1st, 1907, forty-five cents per month; and thereafter, forty-two and one-half cents per month; all payments to be made upon bills to be presented to the city by the Company according to the plan of presenting bills to said city in operation at the time of such presentation.

"Article 4. Maintenance.—The Company will keep the said street lighting system in proper condition for doing the work for which it is intended and leased, and will furnish all of the necessary labor, apparatus, and equipment therefor, without expense to city. It will also furnish all necessary carbons for use in arc lamps, and all of the necessary renewals of said lamps and of the incandescent lamps, as a part of the maintenance of said system. It reserves the right to change or alter the said street system during said period in the interests of safety and efficiency, but so as not to interfere with the efficiency of said system, and so as not to change the location of any of said lamps without the consent of the city. The city shall, from time to time, as may be necessary to protect said system, arrange by the board of commissioners for trimming trees in the public streets, so as to leave a free and safe passage for the said system—to be done at the expense of the Company, when done at its request.

"Article 5. Extensions.—During the leasehold period, excepting the last six months thereof, the Company will make such extensions to said system as may be needed in order to properly light said city; and said extensions, when so made, shall be subject to this lease, and for which rentals shall be paid as

hereinabove stated. Such extensions, however, shall be made at the request of the city, and within a reasonable time thereafter, and only upon the following conditions, to wit: In the matter of installing incandescent lamps, they shall not be installed without the consent of the Company other than in multiples of forty (40) lamps; no installation of incandescent lamps to be made of less than forty (40) without the consent of the Company, and each new installation thereafter shall be so arranged that the lamps shall be spaced not to exceed one hundred and thirty (130) feet apart, and shall be in a continuous string, unless the Company shall find that, by making segregations of other series, it may install new lamps with a part of such segregated series and still be able to maintain its series in multiples of forty (40) lamps; it being the agreement that the city shall not be entitled to have, and the Company will not be bound to furnish, new isolated groups of incandescent lamps of less than forty (40) in different parts of the city.

"During the leasehold period, excepting the last three months thereof, the Company will, at the request of the city, and within a reasonable time, install in said streets such additional like arc lamps as those herein mentioned as the city may require, together with the necessary poles, wires, and other apparatus to be used in connection therewith, provided that no such arc lamp shall be installed at a distance of more than thirteen hundred and twenty (1,320) feet from the next nearest arc lamp on said system then installed; and, when such installation of arc lamps and the necessary connections therewith shall have been made, the same shall be subject to this lease, and rentals shall be paid therefore as hereinabove stated.

"Article 6. Improved Apparatus.—If, during said leasehold period, there shall come into use improved apparatus for lighting, which shall equal or exceed in efficiency, the said incandescent or arc lamps hereinabove mentioned, the Company shall have the right, with the approval of the city council of said city, to substitute such improved apparatus in the place of the apparatus then installed hereunder.

"Article 7. Use by Company.—The Company reserves to itself the right to use its entire street distributing system above mentioned for its own private business, in distributing light and power to its customers, so as in no way to prevent the use thereof by the city for the purpose of lighting its public streets and places. The distributing wires of said system connected with said street lamps, and so to be devoted by the city to its public uses, are to be subject to the exclusive use of the city, and shall be maintained separately from, and disconnected with, the other distributing wires of the Company, and shall be so maintained that the city may, at the Company's power house, receive into said system such electric energy and power as it may need and acquire for the purpose of its public lighting. The city may, from such sources as it may procure electric power, conduct the same into said power house, and from there into said street distributing system so to be used by the city, and may install and maintain in the Company's said power house such system of switches, meters, transformers, and apparatus as it may need in receiving therein and discharging therefrom such electricity as it may require for said purpose.

"Article 8. Defaults.—If the Company shall be prevented by strikes, by any court, by public authority, or by accidents beyond its control, from keeping said system in condition here promised, it shall not be liable in damages to the city for such failure; but it will, immediately after the cause of such prevention shall have been removed, proceed to and diligently prosecute to completion, such repairs as may be necessary to enable it to replace and to keep said system in such condition. A proportionate and equitable deduction of the rental, based on the period of suspension of such perfect condition of the system, shall be made.

"Article 9. Limited Use.—The city shall not be authorized to use the property here leased for any purpose except that of distributing electricity thereon, and using the same for lighting its streets and public uses.

"In witness whereof, the said city and Company have caused their respective names to be hereunto subscribed—the city by its mayor, and the Company by its president—and the corporate seals affixed and attested, the city

by its clerk, and the Company by its assistant secretary, all thereto duly authorized.

"Dated this 30th day of July, 1904.

              "City of Pasadena,
"[Signed]                  By William H. Vedder, Its Mayor.

"Attest: [Signed] Heman Dyer, Its Clerk. [Seal of City of Pasadena.]

              "The Edison Electric Company,
"[Signed]                  By John B. Miller, Its President.

"Attest: [Signed] R. H. Ballard, Its Assistant Secretary. [Seal of the Edison Electric Company.]

"Approved as to form: [Signed] C. J. Willetts, City Attorney.

"Approved as City Electrician: [Signed] A. T. Dickey."

The original as well as the amended complaint, demurrer to each of which was sustained by the court below, contained two alleged causes of action, the first of which was the same in each complaint, with the difference in the second hereinafter indicated. The first count, after alleging the execution by the respective parties of the contract above set out, alleged: That on the 1st day of July, 1904, the defendant city entered into possession and use of the electric system and property described in the contract, and continued in such possession and use to and including July 31, 1906, during which time the plaintiff duly performed all the conditions of the contract on its part to be performed. That during the period beginning July 1, 1904, and ending October 31, 1905, the defendant city duly performed all the conditions of the contract on its part to be performed. That, under and pursuant to the terms of the contract, the plaintiff, at its own cost and expense, extended the said electric distributing system and the apparatus connected therewith at the request of the defendant city, so that from November 1, 1905, to July 31, 1906, both inclusive, there were installed in the public streets and places in the said city of Pasadena, and in its possession and use, under the contract, arc lamps and apparatus and equipment connected therewith, and incandescent lamps and apparatus and equipment connected therewith, in addition to the number of such arc and incandescent lamps and the apparatus and equipment connected therewith, installed, and turned over to the city on the 1st of July, 1904, as follows: "From November 1st, 1905, to July 31st, 1906, both inclusive, 16 additional arc lamps, and all apparatus and appurtenances and equipment connected therewith. During the month of November, 1905, 191 additional incandescent lamps, and all apparatus, appurtenances and equipment connected therewith. From the 1st of December, 1905, to the 31st of July, 1906, both inclusive, 197 additional incandescent lamps, and apparatus, appurtenances, and equipment connected therewith." That said additional arc and incandescent lamps and the poles, wires, and all apparatus appurtenances, and equipment connected therewith were installed in all respects as provided in the contract. That for the fiscal year commencing July 1, 1905, and ending June 30, 1906, the defendant city did, in the manner required by law, provide income and revenue sufficient to pay all amounts which would become due during said fiscal year under and pursuant to the terms of the contract from the defendant to plaintiff, and did duly set aside and create a fund for the payment of all amounts to become due during that fiscal year from the defendant to plaintiff. under the contract, and that there is now in the possession and control of defendant city sufficient moneys from the income and revenue provided for said fiscal year and so set aside and apportioned to said fund to pay all amounts due and owing from the defendant city to the plaintiff, under the terms of the contract, from November 1, 1905, to June 30, 1906, both inclusive. That for the fiscal year commencing July 1, 1906, and ending June 30, 1907, the defendant city did, in the manner required by law, provide an income and revenue sufficient to pay all amounts which would become due during said fiscal year under the contract from the defendant to the plaintiff, and did duly set aside and create a fund for the payment of all amounts to become due during said fiscal year from the defendant to the plaintiff under the contract, and that there is now in possession and control of the defendant city sufficient money from the income and revenue provided for said fiscal year and so set aside and apportioned to pay

all amounts due from the defendant city to the plaintiff under the contract from July 1, 1906, to July 31, 1906, both inclusive. That the defendant city did in the manner required by law provide for the fiscal year ending June 30, 1906, and for the fiscal year ending June 30, 1907, sufficient income and revenue to pay all legitimate indebtedness of the city for each of said fiscal years, including all amounts which would become due and were now due from the defendant city to the plaintiff under the contract for the months of November, 1906, to July, 1906, both inclusive. That the plaintiff heretofore, and in due time, and in proper manner, presented to the city council of the defendant city, in writing, on forms supplied to it by the city clerk, its demand for the payment by the defendant to the plaintiff of the rental due from the defendant to the plaintiff under the terms of the contract for the months of November, 1905, to July, 1906, both inclusive, and that said demands were rejected by the city, and that the city has not paid the plaintiff the rental reserved in the contract for the months of November, 1905, to July, 1906, both inclusive, amounting to the sum of $8,683.96, and still refuses to pay the plaintiff the same.

The second count of the original complaint also set out the written contract of July 30, 1904, and alleged the defendant's possession and use of the property thereunder, the plaintiff's performance of the conditions of the contract, and its making of certain extensions and additions therein provided for, the defendant's provision and apportionment of revenues sufficient to pay the alleged indebtedness of the plaintiff, the presentation of the plaintiff's demand, the alleged reasonable use of the property from October 31, 1905, to July 31, 1906, and the defendant's refusal to pay the demand made by plaintiff.

The second cause of action alleged in the amended complaint omitted all express reference to the written contract of July 30, 1904, but alleged that from November 1, 1905, to July 31, 1906, the plaintiff, at the defendant's request, permitted the defendant to have the use and possession of the plaintiff's electric lighting system; that during said use by the defendant the plaintiff made certain extensions and additions to the system, and that such extensions and additions were necessary and essential to it; that the defendant used the said system in lighting its streets and other public places. Similar allegations were then made in respect to the reasonable value of the use of the plaintiff's electric system during the period recited, the presentation of the plaintiff's demand, the apportionment and sufficiency of the city revenue, and the rejection of the demand by the city.

The judgment prayed in both the original and amended complaints was for $8,683.96, with interest and costs. The demurrer to each complaint being sustained, judgment was entered for the defendant city. The case is brought here by the plaintiff below.

H. H. Trowbridge and Willoughby Rodman, for plaintiff in error.

J. P. Wood, for defendant in error.

Before GILBERT, ROSS, and MORROW, Circuit Judges.

ROSS, Circuit Judge (after stating the facts as above). One of the errors of counsel for the plaintiff in error lies in the assumption that, unless the contract in question expressly states that it provides for the lighting of the streets of the city, no such intention can be attributed to the instrument as the case is presented. That is not at all so. It is often easy to ascertain the true meaning of a written instrument by taking it by its four corners, even though expression of its real intention be purposely concealed. Quite true it is, as said by counsel, that in its caption the agreement is called "Contract leasing street lighting system," and in its body it is spoken of as a "lease," that the city "hires" from the company, and that the sums therein mentioned to be paid by the city are called "rentals." But these names are by no means of themselves conclusive of the true character of the instrument. It

will be observed that in the contract above set out there is nothing said about where the electric power was to come from. But in the companion suit between the same parties, also under submission to us and next to be disposed of, it appears that at the same time, to wit, July 30, 1904, another written contract was entered into between them, whereby the plaintiff was to furnish the power to be used through the so-called "leased" system for one year, upon certain specified terms, with provisions therein made for extensions of that agreement covering the entire period of five years for which the "system" is claimed to have been leased to the city.

Turning to the so-called lease, we find, first, a recital of these facts:

"That the Company is the owner, and enjoying the use and occupation, within the public streets of the city of Pasadena, of a system of poles, wires, lamps, brackets, and other apparatus constituting a complete street equipment for the purpose of transmitting electricity, and for the purpose of lighting the public streets and places within said city, as well as furnishing light and and power to others than said city; that during several years prior to the date hereof it has, with the use of a portion of said system, been furnishing the city with electric light for lighting its streets and public places; that scattered about the said city, and in places located by said city, there are now installed and in use for lighting said city as a part of said street lighting system fifty-four (54) long burning arc lamps, and thirteen hundred and twenty-one (1321) 16-candle power incandescent lamps, all properly connected with the necessary apparatus for their present actual and continued use; that the city wishes to light its streets and public places at a less expense for area lighted than heretofore."

And then follows a pretended leasing to and hiring by the city of "that part of the Company's said electric distributing system within said streets and public places, which is now, and heretofore has been, used for the purpose of furnishing the city with light, together with such extensions thereof as may during such leasehold period be installed for such lighting purposes," for a period of five years, at a lump sum per year as rental for the use of that part of the system for the first three years, and another and different lump sum per year for the last two years, and certain monthly payments for certain extensions to the system which, it is declared, shall also be covered by the "lease." And this specified part of the system, the contract provided, the company would keep "in proper condition for doing the work for which it is intended and leased, and will furnish all of the necessary labor, apparatus, and equipment therefor, without expense to the city"—most extraordinary provisions, certainly, if the city was really the lessee of the property. What possible reason can be assigned for the company furnishing the labor necessary for carrying on the city's business? Then, too, the contract provides that, "during the leasehold period, excepting the last six months thereof, the company will make such extensions to said system as may be needed in order to properly light said city"—not in order that the city might be properly lighted by the city itself, but that the company will make such extensions to said system as may be needed "in order to properly light said city"; in other words, that the company will make such extensions as may be needed to enable it, the company, to properly light the city. And these provisions are followed by the declaration that:

"The Company reserves to itself the right to use its entire street distributing system above mentioned for its own private business, in distributing light and power to its customers, so as in no way to prevent the use thereof by the city for the purpose of lighting its public streets and places."

We think it perfectly evident that the two contracts entered into between these parties on the 30th day of July, 1904, the one upon which the present suit is based and that upon which the companion suit, numbered 1,740, infra, also under submission, is based, were parts and parcels of one scheme to evade those provisions of the charter of the defendant city expressly declaring that:

"No contract for removing garbage, sweeping, sprinkling, or lighting the streets, public buildings, places or offices, shall be made for a longer period than one year, nor shall any contract to pay for power, gas or electric light at a higher rate than the minimum price charged to any other consumer be valid."

"The city of Pasadena shall not be and is not bound by any contract, except as otherwise provided herein, unless the same is made in writing by order of the council and signed by the mayor or by some other person, in behalf of the city, authorized so to do by the council; provided, that the approval of the form of the contract by the city attorney shall be endorsed thereon before the council shall have power to order the same to be entered into in behalf of the city; but the council, by an ordinance duly adopted, may authorize any officer, board or commission or agent of the city to bind the city without a contract in writing for the payment for supplies, labor or other valuable consideration furnished to the city in an amount not exceeding one hundred dollars." Sections 1 and 8 of article 10 of the charter of the city (St. 1901, pp. 911, 912).

The positive prohibition of a statute can no more be avoided by evasion than it can be violated directly. A citation of authorities upon so plain a proposition is unnecessary. So, too, is the law well settled that where, as in the cases between these parties here under consideration, the contract upon which suit is brought is forbidden by statute, the acceptance of benefits raises no implication of an obligation. The law is not properly chargeable with the absurdity of implying an obligation to do that which it forbids.

The judgment is affirmed.